# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5989 | **DATE** | 8/24/2004 |
| **CASE TITLE** | Cady vs. Sheahan et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Plaintiff's first motion for leave to amend his first amended complaint [86-1], plaintiff's second motion for leave to amend his first amended complaint [89-1], defendants' second motion to strike plaintiff's motion for summary judgment [71-1], plaintiff's third motion for sanctions against defense counsel [90-1], defendants' motion to strike plaintiff's supplemental statement of uncontested material facts [92-1], plaintiff's motion to strike defendants' supplemental statement of material facts filed July 23, 2004 and plaintiff's motion for leave to file an Am. L.R. 56.1(b)(2) and (3) response instanter are denied. Plaintiff's motion for summary judgment [54-1] is denied, defendants' motion for summary judgment [53-1] is granted and judgment is hereby entered in favor of defendants Sheriff Michael Sheahan, Officers William Barbat, William Margalus, William Jacoby, and Gonzalo Lucio and against plaintiff, Davy Cady. This is a final and appealable order. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | 2 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | AUG 2 5 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | 95 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 8/24/2004 date mailed notice | |
| KF | courtroom deputy's initials | | KF6 mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVY CADY,                      )
                               )
    Plaintiff,              )
                               )   **No. 02 C 5989**
    v.                      )
                               )   **Mag. Judge Michael T. Mason**
MICHAEL SHEAHAN, SHERIFF, et al.,  )
                               )
    Defendants.             )

**DOCKETED**

AUG 25 2004

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Before the court are plaintiff's two motions to amend his complaint, the parties' cross-motions for summary judgment, and defendants' second motion to strike plaintiff's motion for summary judgment.[1] For the reasons set forth below, plaintiff's two motions to amend his complaint are denied, defendants' motion for summary judgement is granted, plaintiff's motion for summary judgement is denied, and defendants' second motion to strike plaintiff's motion for summary judgment is denied.

### *Procedural History*

On December 20, 2002, *pro se* plaintiff Davy Cady ("Cady" or "plaintiff") filed this amended eleven-count §1983 civil rights action against Cook County Sheriff Michael Sheahan, several sheriff's officers including William Barbat, William Margalus, William Jacoby, Gonzalo Lucio, James Malinowski, Thomas Fitzgerald, unknown officers, and

---

[1]Also pending before the court are: (1) Pl.'s Third Mot. for Sanctions Against Defs.' Counsel; (2) Defs.' Mot. to Strike Pl.'s Supp. Stmt. of Uncontested Material Facts; (3) Pl.'s Mot. to Strike Defs.' Supp. Stmt of Material Facts Filed July 23, 2004; and (4) Pl.'s Mot. for Leave to File an Am. L.R. 56.1(b)(2) and (3) Resp. *instanter* to Defs.' Rule 56.1 Mot. to Dismiss Filed July 23, 2004. Each of these motions is denied.

95

"sheriff's counsel" Paul O'Grady (collectively "defendants"). Defendant Sheahan responded with a motion to dismiss. On February 5, 2003, Judge Grady granted in part and denied in part defendant Sheahan's motion and dismissed a number of plaintiff's claims *sua sponte*.

Specifically, Judge Grady dismissed all claims against defendant Sheahan in his individual capacity. *Sua sponte*, the court dismissed Counts IV, V, VI, VIII, and IX with prejudice, thus dismissing O'Grady, Malinowski, and Fitzgerald as defendants in this action. Generally, three categories of claims remain pending before this court; plaintiff's Section 1983 claims (Counts I, II and III) against defendants Barbat, Margalus, Jacoby, Lucio[2], and "various unknown others"; his *Monell* claim (Count VII) against defendant Sheahan in his official capacity; and his two state law claims for negligent and intentional infliction of emotional distress (Counts X and XI).

### Plaintiff's Motion to Amend his First Amended Complaint

Before turning to the parties' cross-motions for summary judgment, we first address plaintiff's two motions to amend his complaint. On July 22, 2004, more than seven months after fact discovery closed on November 20, 2003, and more than nineteen months after plaintiff filed his First Amended Complaint on December 20, 2002, plaintiff filed a motion to amend his First Amended Complaint. In this motion plaintiff seeks leave of court to assert a new claim for common law conversion arising from the defendants' search of his briefcase. Approximately three weeks later, on

---

[2]When collectively referring to the remaining identified defendant officers, William Barbat, William Margalus, William Jacoby, and Gonzalo Lucio, we will use the terms "Officers," "defendants," or "defendant officers."

August 11, 2004, plaintiff filed a second motion for leave to amend his First Amended Complaint. In his second motion, plaintiff seeks leave of court to assert an additional claim for "Religious Discrimination [sic] Violation of First Article, U.S. Bill of Rights." *Pl.'s Second Mot. for Leave to Amend His First Am. Compl.* at 2. Specifically, plaintiff alleges that defendants violated his constitutional rights because they (1) considered the fact that plaintiff had a beard, and (2) may have considered the fact that he was wearing a long-sleeve shirt in the summertime, as part of the basis for approaching him and effectuating a *Terry*[3] stop in the early morning of August 22, 2001.[4]

Federal Rule of Civil Procedure 15(a) governs when and how a pleading may be amended. It provides, in pertinent part, that:

> A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time

---

[3]*See Terry v. Ohio*, 392 U.S. 1 (1968) (allowing police officers to conduct a brief, investigatory stop and frisk of a person if they have a reasonable suspicion, based on articulable facts, that a crime has been or is about to be committed).

[4]In support of his proposed amendment, plaintiff attached an affidavit to his "Second Motion to Amend his First Amended Complaint." In the affidavit he stated "1. At some point in time during the 1990's I became convinced by fundamentalist Christian acquaintances and by the Holy Ghost that the Creator of the universe was and is pleased that He had created two genders of mankind and had established His divine intent and divine law for there to prevail on earth maximum differences in appearances between them – at least when they are in public and exposed to the possible view of the opposite gender. ... 3. Since the male gender of mankind (in most races thereof) is the only human gender capable of growing facial hair, it also became in the 1990's and remains clear to me that facial hair on men was and is one of the ways that the Creator of the universe used to establish a maximum difference in appearance between the genders. ... 5. A related biblical standard of which I became convinced during the 1990s and of which I remain convinced is that of godly modesty, which includes the semi-standard of maximum loose (as opposed to tight) covering of the body at all times, including, impliedly, a prohibition against short pants and short-sleeved shirts or short-sleeved blouses – at least when men and women are in public and exposed to the possible view of the opposite gender." *Pl.'s Aff. of Religious Convictions* at 1.

within 20 days after it is served. Otherwise a party may amend the party's pleadings only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

According to the Supreme Court, amendments to a party's complaint should be granted in:

> . . . the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, *undue prejudice to the opposing party by virtue of allowance of the amendment*, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'
>
> *Foman v. Davis*, 371 U.S. 178, 181, (1962) (emphasis added).

"The decision to deny or grant a motion to amend is within the discretion of the trial court." *Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987) (citing *Foman*, 371 U.S. at 181). Cady's proposed amendments are based on information known to him at the time he filed his First Amended Complaint nineteen months ago. In fact, these new proposed claims are based on the same facts as the counts in his First Amended Complaint. Further, plaintiff filed these motions 7 months after the close of fact discovery and while the parties' fully-briefed cross-motions for summary judgment were pending before the court.

Plaintiff has not provided the court with an explanation for his unreasonable delay in moving to amend his complaint. Plaintiff simply argues that because the court ordered additional briefing on a pending claim both parties failed to address in their cross-motions for summary judgment, fairness requires the court to allow him to amend his complaint. This argument is contrary to law. Allowing plaintiff's proposed amendments after such an inexcusably long delay and at this stage in the litigation

4

would unduly prejudice defendants. Accordingly, Cady's two motions to amend his First Amended Complaint are denied. *See Kleinhans*, 810 F.2d at 625-26 (affirming the trial court's denial of a motion to amend on facts similar to those in the case at bar).

### *Cross-motions for Summary Judgment*

Next, we turn to the parties' cross-motions for summary judgment. We begin by addressing some procedural issues. Plaintiff filed his original motion for summary judgment on March 1, 2004. In response, defendants filed a motion to strike plaintiff's statement of uncontested material facts for failure to comply with Northern District of Illinois Local Rule 56.1. On April 14, 2004, we granted defendants' motion in a minute order, pertinent portions of which follow:

> Plaintiff's statement of uncontested facts is stricken for failure to comply with Local Rule 56.1(a)(3). ... Plaintiff is ordered to submit a revised 56.1 statement of uncontested material facts that strictly complies with Local Rule 56.1. Each factual assertion must be supported by a specific citation to the record. Plaintiff is reminded that his 56.1 statement should only include facts material to his summary judgment motion. It should not include arguments, legal conclusions, conjecture or speculation. Plaintiff's revised 56.1 statement to be filed by 5/10/04. (internal citations omitted).

Plaintiff filed his "amended" Local Rule 56.1 statement on May 10, 2004, pursuant to our order. Unfortunately, his "amended" filing suffers from the same procedural defects as his original filing. Rule 56.1 requires a specific reference to the record for all facts and emphasizes that it is inappropriate to include legal conclusions and/or arguments in a 56.1 statement. *Cady v. Miss Paige, Ltd.*, 02 C 4867, 2004 WL 1144044 (N.D. Ill. Apr. 30, 2004). The Seventh Circuit has repeatedly upheld strict enforcement of Rule 56.1 and has sustained the entry of summary judgment when the non-moving party failed to comply with the rule. *Id.* (citing *Midwest Imports, Ltd. v.*

*Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (citing cases)).

Plaintiff's amended 56.1 statement includes ninety paragraphs. The first fifty paragraphs contain inaccurate and imprecise citations.[5] Further, plaintiff's 56.1 statement is filled with conjecture, speculation and irrelevant information.[6] In addition to plaintiff's "amended" 56.1 statement, he also filed a motion for summary judgment, an (unfinished) memorandum of law in support of his motion, an index of exhibits, and an affidavit.

In response to plaintiff's "amended" 56.1 statement, defendants filed what they entitled a "Second Mot. to Strike Pl.'s Mot. for Summ. J."[7] This court is required to

---

[5]Each paragraph is followed by "(Rf: ¶ _)." However, plaintiff does not provide the name of the specific document he is referencing. For example, paragraph 5 of plaintiff's 56.1 statement contains a citation to (Rf: ¶17), which the court believes references paragraph 17 of plaintiff's first amended complaint, while paragraph 37 of plaintiff's 56.1 statement contains a citations to (Rf: ¶2), which we believe references paragraph 2 of plaintiff's affidavit.

[6]For example, paragraph 37 reads as follows: "Neither on the morning of August 22, 2001 outside the Bridgeview Courthouse, when [p]laintiff was interdicted by [d]efendants and queried as to his purpose in being there, nor at any other time in his entire life did he ever tell (or write to) [t]hem or to any other human being that he was or is a "federal officer." In fact, for [p]laintiff to be a federal or any other kind of governmental officer would have been and would still be so foreign to his convictions and to his nature as a very private person and as a political dissident that it would contradict almost everything that he has stood for – at least since his first public political demonstration in high school in 1964 – as a critic of the nature of the contemporary American federal government as being not 'de jure' but 'de facto.' This statement is supported by [p]laintiff's consistent refusal to become a government – esp. a federal – employee, despite protracted periods of unemployment and/or poverty that he has endured, when governmental employment, including federal employment, was potentially available to him as it is to most Americans."

[7]However, a careful review of the docket shows that defendants' original motion was merely a motion to strike plaintiff's 56.1 statement, not a motion to strike his entire motion for summary judgment. Therefore, defendants' "second" motion to strike plaintiff's motion for summary judgment, is actually an original motion to strike.

liberally construe *pro se* pleadings, even for experienced *pro se* litigators like Mr. Cady.[8]
*Greer v. Board of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). "The essence of liberal
construction is to give a *pro se* plaintiff a break when, although he stumbles on a
technicality, his pleading is otherwise understandable." *Id.* (quoting *Hudson v. McHugh*,
148 F.3d 859, 864 (7th Cir. 1998). "However, a lawsuit is not a game of hunt the
peanut." *Greer*, 267 F.3d at 727. Courts are not obligated to "scour the record looking
for factual disputes." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th
Cir. 1993). Because Cady's pleadings are filed *pro se* and we are required to construe
them liberally, defendants' motion to strike is denied.

However, because plaintiff failed to comply with Local Rule 56.1, we adopt
defendants' statement of facts in deciding the summary judgment motions. It should be
noted that we have reviewed and analyzed all of the material Cady filed with the court,
and when appropriate, we have taken into consideration his submissions. Now, we turn
to the merits of the cross-motions.

### Factual Background

The events that serve as the basis for plaintiff's complaint occurred outside the
Cook County Courthouse ("Courthouse") in Bridgeview, Illinois between approximately

---

[8]Mr. Cady has filed six other unsuccessful *pro se* actions in the District Court for the
Northern District of Illinois and two unsuccessful appeals with the Seventh Circuit Court of
Appeals. *See Cady v. Cook County, Illinois*, 02 C 8333, 2003 WL 21360898 (N.D. Ill. June 11,
2003) (Nordberg, J.); *Cady v. Miss Paige, Ltd.*, 02 C 4867, 2004 WL 1144044 (N.D. Ill. Apr. 30,
2004) (Andersen, J.); *Cady v. City of Chicago*, 01 C 5152 (N.D. Ill. April 22, 2002) (Nordberg,
J.), *aff'd*, 02 C 3661, 2003 WL 21018245 (7th Cir. May 5, 2003) (unpublished order); *Cady v.
South Suburban College*, 02 C 8128 (N.D. Ill. Nov. 14, 2003) (Bucklo, J.); *Cady v. Village of
McCook*, 01 C 4375, 2002 WL 999429 (N.D. Ill. May 14, 2002), *aff'd*, 02 C 2579, 2003 WL
124184 (7th Cir. Jan. 13, 2003) (unpublished order); *Cady v. Dacosta*, 02 C 3188 (N.D. Ill June
12, 2002) (Zagel, J.).

6:15 and 7:10 a.m. on August 22, 2001. Cady arrived at the Courthouse between 6:15 and 6:30 a.m., about two hours before he knew it opened to the public at 8:30 a.m., in an attempt to effectuate service of a summons on a Cook County Sheriff's Police Officer. Cady was dressed in dirty, blue pants and a dirty, wrinkled shirt. He had a beard and had not showered that day. Cady was carrying a briefcase and was walking along the outer sidewalk on the east side of the Courthouse. Cady also walked along the inner sidewalk right next to the Courthouse, which was obscured by bushes.

Cady was at the Courthouse for about 10 - 25 minutes before he was first approached by defendant Lucio at approximately 6:40 a.m.[9] Officer Lucio asked Cady why he was at the Courthouse. Cady responded that he was waiting there, as inconspicuously as possible, to serve federal process on an officer. *Cady Aff.* ¶ 4. Officer Lucio also asked Cady for identification. Cady's reply to the later inquiry was unresponsive. He asked the officer why he was requesting identification. Plaintiff also may have asked Officer Lucio if he was effectuating a *Terry* stop.[10] Plaintiff did not have any identification on his person at the time, however, plaintiff did not provide defendants with that information at the outset of their inquiry. In fact, plaintiff admits to engaging Officer Lucio in a dialog about whether individuals are required by law to carry an I.D. and specifically whether a process server is obligated by law to carry an I.D.

---

[9]Lucio was the first named defendant to encounter plaintiff. Prior to Lucio's arrival, plaintiff was questioned by one or two court service deputies ("deputies"), who summoned Lucio for assistance. One of the deputies told Lucio that a suspicious person was posing a problem.

[10]In his deposition ,Cady could not specifically remember whether he asked Officer Lucio if he was effectuating a *Terry* stop, but Cady had responded in that matter during previous encounters with police officers. *Cady Dep.* at 84.

At the insistence of Cady, Officer Lucio summoned a supervisor, Officer Barbat. Officer Barbat also asked Cady for identification and for his purpose in being at the Courthouse hours before it opened. Cady provided Officer Barbat with the same *non-responsive answer he gave Officer Lucio*. Cady asked why Barbat was enquiring about his I.D. and whether Barbat was conducting a *Terry* Stop. Cady also engaged Officer Margalus in a similar discussion. Cady repeatedly refused to provide any identification.[11] Plaintiff conceded that he did not have a problem with the Officers momentarily stopping him, but felt that once he told them his purpose for being there, namely to serve federal process, the inquiry should have ended. Cady told the Officers, and makes the argument to this court, that to require him to provide an I.D. or his identity is a violation of his Fifth Amendment right against self-incrimination.

While the Officers where questioning Cady, he repeatedly opened and reached into his briefcase. *Margalus Dep.* at 14. During the questioning, in order to quote from the Federal Rules of Civil Procedure, Cady removed a Sullivan's Law Dictionary from his briefcase multiple times. *Cady Aff.* ¶ 8. After Cady repeatedly opened and reached into his briefcase, one of the Officers took the briefcase out of plaintiff's hands, placed it on the hood of a squad car and searched its contents for weapons and to ascertain plaintiff's identity. *Barbat Dep.* at 49; *Cady Aff.* ¶ 10. After searching the contents of the briefcase, an Officers placed it in a squad car. Eventually, the Officers obtained

---

[11]Cady takes issue with the term "refused," arguing that he could not refuse to produce an I.D. because he did not have any identification with him at the time. However, plaintiff concedes that he did not simply tell the Officers that he did not have any identification, instead, he "challenge [d]efendants to explain why they were demanding such information from him." *Pl.'s 56.1(b)(3) Stmt.* ¶17.

plaintiff's name, either from his Bible or from him. The Officers ran the name in their computer but could not find a match. Then, Officer Margalus told plaintiff that if he continued to refuse to identify himself, "he would be subject to arrest for obstruction of a police officer." *Margalus Dep.* at 24. Plaintiff continued to refuse. Officer Jacoby took out his handcuffs and told plaintiff to put his hands behind his back, but never handcuffed Cady. Cady then told the Officers his name and date of birth. The Officers quickly found plaintiff's name in their computer. *Cady Aff.* ¶ 13. Once the Officers verified that Cady did not have a criminal record, they returned his briefcase and allowed him to leave without delay. The entire incident lasted 20-30 minutes and plaintiff has not alleged any physical injuries resulting from the incident. *Pl.'s 56.1(b)(3) Stmt.* ¶ 26.

**Legal Analysis**

**Standard of Review**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We must evaluate the admissible evidence supporting the motion in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, we can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "Rule 56(c) mandates summary judgment when the nonmoving party fails to establish the

existence of an element essential to its case and on which that party will bear the burden of proof at trial." *Jefferson v. City of Chicago*, No. 97 C 4895, 2000 WL 1368036 (N.D.Ill., Sept. 15, 2000) (citing *Anderson,* 477 U.S. at 252).

### Section 1983 Claims

Pursuant to 42 U.S.C. §1983, plaintiff has alleged claims for false imprisonment (Count I), false arrest (Count II), and unlawful search and seizure in violation of the Fourth Amendment (Count III).[12] "The standards for a successful Section 1983 action against local police officers or a municipality are well known." *Ineco v. City of Chicago*, 286 F.3d 994, 997 (7th Cir. 2002). The first step, which is dispositive in this case, requires plaintiff to show that he was deprived of some federal right. *Id.* at 998. The second step requires a showing that persons acting under color of state law caused the constitutional deprivation. *Id.* at 997-98. The parties do not dispute that defendants were acting under color of law.

Cady argues that his 20-30 minute encounter with the Officers violated his Fourth Amendment right to be free from an unreasonable search and seizure. A Fourth Amendment seizure occurs when an officer's actions restrain a person's freedom to walk away from the encounter. *See United States v, Mancillas*, 183 F.3d 682, 695 (7th Cir. 1999) (quoting *Terry*, 392 U.S. at 16). Seizures fall into one of two categories; brief investigatory stops and full custodial arrests. *See Mancillas*, 183 F.3d at 695. Both

---

[12] The Fourth Amendment provides for "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

11

parties agree that Cady was not the subject of a full custodial arrest. However, he was subjected to a brief investigatory stop, also known as a *Terry* Stop. *See Terry*, 392 U.S. at 1. Therefore, the question before us is whether the *Terry* stop was unreasonable, because the Fourth Amendment only protects against *unreasonable* searches and seizures. *See Mancillas*, 183 F.3d at 695. If the stop was reasonable, it did not violate plaintiff's Fourth Amendment rights and his §1983 claims cannot prevail.

A *Terry* stop is reasonable if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Mancillas*, 183 F.3d at 695 (quoting *Terry*, 392 U.S. at 21). Officers may effectuate a *Terry* stop for a wide variety of purposes, including the investigation of possible criminal behavior, or to help an intoxicated person find his home. *See Terry*, 392 U.S. at 13-14. In order for a *Terry* stop to be reasonable, the officer's actions must be justified at the inception of the stop, *and* the stop must be reasonably related in scope to the circumstances which justified its inception. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).

In evaluating the reasonableness of the stop, the facts must be "judged against an objective standard: would the facts available to the officer [at] the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *United States v. Robinson*, 30 F.3d 774, 782 (7th Cir. 1994) (citing *Terry*, 392 U.S. at 21-22). We look at the "totality of the circumstances," including the "experience of the law enforcement agent and the behavior and characteristics of the suspect." *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir.

12

1995). When evaluating the "totality of the circumstances – the whole picture – must be taken into account." *Robinson*, 30 F.3d at 782. This includes the location of plaintiff, the time of day, and plaintiff's appearance, demeanor and actions. *See United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002).

The stop at issue in this case occurred on August 22, 2001 in front of the Bridgeview Courthouse about two hours before it opened to the public. This was approximately six years after the catastrophic bombing of the federal building in Oklahoma City in 1995 and three weeks before the horrific September 11, 2001 terror attacks in New York City, Washington D.C., and Pennsylvania. The Seventh Circuit has recognized that the 1995 Oklahoma City bombing "engendered heightened fears for the security of government buildings, [and that] [e]ven before then courthouses had been recognized as potentially dangerous places because of the presence of criminal defendants, bitterly divorcing spouses and custody-contesting ex-spouses, and other highly stressed, emotionally excited, and even violence prone litigants." *Braun v. Baldwin*, 346 F.3d 761, 765 (7th Cir. 2003).

In addition to plaintiff's location at a government building, the defendant officers have articulated a number of other factors supporting their decision to effectuate a *Terry* stop on plaintiff. First, defendants cited the time of day; between 6:15 and 6:30 a.m., which was approximately two hours before the Courthouse opened to the public. Defendants also cited Cady's disheveled appearance. He was wearing dirty, wrinkled clothing, had a beard, and had not showered. Further, plaintiff was carrying a briefcase. Defendants also cited Cady's location on an inner sidewalk immediately next

13

to the Courthouse, which was obscured by bushes, instead of the outer sidewalk that the public normally uses. Finally, the Officers cited plaintiff's demeanor and his apparent attempt to be inconspicuous. Cady readily admitted that he was attempting to be inconspicuous to facilitate serving federal process on an Officer. A disheveled person, carrying a briefcase and attempting to be inconspicuous as he lurks outside a courthouse more than two hours before it opens gives rise to reasonable articulable suspicion for an officer to approach Cady and inquire about his identity and his purpose in being at the Courthouse. Although each individual fact when viewed in isolation may not necessarily rise to the level of reasonable articulable suspicion required under *Terry*, the totality of the circumstances certainly gave rise to reasonable articulable suspicion, justifying the stop. In fact, Cady agrees with this conclusion. *See Pl.'s Combined 56.1(b)(3) and Br. in Resp. to Defs.' Mot. for Summ. J.* at 8 ("Plaintiff has never alleged that [d]efendants did not have [a reasonable basis for the initial inquiry], nor has he complained about Officer Lucio's initial approach.").

Plaintiff's sole objection is to the nature and length of the inquiry. Plaintiff makes the untenable argument that although defendants were justified in approaching him and inquiring as to his purpose, they could not inquire as to his identity or request identification. Plaintiff's argument that defendants were required to end their inquiry when he identified himself as a federal process server and that they could not request some form of identification or his full name is contrary to law. "[I]t is well established that an officer may ask a [person] to identify himself in the course of a *Terry* stop." *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County,* 124 S.Ct. 2451,

14

2459, 2004 WL 1373207 at *7 (June 21, 2004). "Questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Id.* at 2458 (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time.")). Such an inquiry is not, as plaintiff argues, a violation of his Fifth Amendment right against self-incrimination.

Having found that the initial *Terry* stop was warranted and that the scope, including inquires into Cady's identity were justified, we must now determine the reasonableness of the duration of the stop. Generally, *Terry* stops must be brief, however, longer *Terry* stops are not unreasonable when the plaintiff's refusal to cooperate contributes to the delay. *See United States v. Sharpe*, 470 U.S. 675, 687-88 (1985) (twenty minute stop not unreasonable when the subject's actions contributed to the delay); *Robinson*, 30 F.3d 774, 782 (7th Cir. 1994) (twenty minute stop not unreasonable where the subject gave "misleading answers").

The *Terry* stop at issue lasted somewhere between 20-30 minutes. However, plaintiff was responsible, in large part, for the extended duration. Cady provided evasive, unresponsive and argumentative answers to the Officers' questions. By his own admission, instead of stating his name, Cady engaged the Officers in repeated dialogs regarding applicable law. Plaintiff referenced his Sullivan's Law Dictionary and quoted the Federal Rules of Civil Procedure on several occasions.

Cady only provided his identity to the Officers once they threatened to arrest him.

15

Once he provided that information, the Officers quickly ran a computer check,

determined that plaintiff did not have any outstanding warrants and quickly sent him on

his way. As defendants correctly point out, "[h]ad [p]laintiff complied with the officers'

initial request for identification and not engaged them in a debate as to his rights and

the law, the entire encounter might have only lasted a few minutes." *Defs.' Mot. for

Summ. J.* at 7.

Additionally, plaintiff was responsible, in part, for the number of Officers involved

in the stop. Cady specifically requested that Officer Lucio summon Officer Barbat, a

supervisor. Had Cady provided Officer Lucio with his name, when he initially asked for

it, Officer Barbat and Officer Margalus would likely not have intervened.

In addition to being justified in conducting a 20-30 minute *Terry* stop, the Officers

could have lawfully arrested defendant. *See Hiibel*, 124 S.Ct. at 2451, 2004 WL

1373207 at *1 (June 21, 2004). In *Hiibel*, the Supreme Court held that state "stop and

identify" statutes, which require an individual to disclose his name during a *Terry* stop,

do not violate a person's Fourth Amendment rights, as long as the request for

identification is "reasonably related in scope to the circumstances which justified" the

stop. *Id.* at 9 (quoting *Terry*, 392 U.S. at 20). Illinois has just such a "stop and identify"

statute, allowing officers to request a person to produce identification. *Hiibel* at 2456

(citing Ill. Comp. Stat. 725 5/107-14) (permitting an officer to ask or require a suspect to

disclose his identity).

Plaintiff's reliance on *Brown v. Texas* in support of his motion for summary

judgment is misplaced. 443 U.S. 47 (1979). In *Brown*, the requisite reasonable

suspicion for the initial stop never existed. *Hiibel*, 542 U.S. at 2457 (citing *Brown*, 443 U.S. at 52). However, as discussed *supra*, Officer Lucio did have a reasonable basis to effectuate the *Terry* stop at issue and thus plaintiff was required to identify himself when requested to do so. On these facts, there is no Fourth Amendment violation for an unlawful seizure. Accordingly, defendants' motion for summary judgment is granted as to plaintiff's claims for false imprisonment, false arrest, and an unlawful seizure. Plaintiff's motion for summary judgment is denied as to those claims.

**Unlawful Search**

We now turn to plaintiff's claim that defendants violated his Fourth Amendment right to be free from unlawful searches. When a law enforcement officer has lawfully stopped an individual as in this case, he is allowed to "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. The Supreme Court further held that "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

Similar to the seizure addressed above, the reasonableness of a protective search for weapons as outlined in *Terry*, is judged by an objective standard and must be based on articulable facts, which taken together with natural inferences, reasonably warrant the intrusion at issue. *Id*. Plaintiff was lurking outside a government building, holding a briefcase, hours before the building opened to the public. When the defendant officers approached him, he refused to identify himself, engaged them in conversation and repeatedly reached into his briefcase. Officer Margalus stated that based on his twelve years of experience and the totality of the circumstances, including plaintiff reaching into his briefcase while being questioned by law enforcement officers, he was concerned for the Officers' safety and felt that the briefcase may contain weapons. *Margalus Dep.* at 6,14-15. Judging the facts from an objective standard, we cannot disagree. The Officers' decision to conduct a search, limited to examining the contents of Cady's briefcase, was not unlawful. The protective search was limited in duration and scope to ensure the safety of the officers. Once the officers concluded that plaintiff's briefcase did not contain weapons, they placed it in a patrol car. Almost immediately upon determining plaintiff's identity and that he did not have a criminal record, the Officers returned Cady's briefcase and informed him that he was free to leave. Accordingly, on these facts, there is no Fourth Amendment violation for an unlawful search. Therefore, defendants' motion for summary judgment is granted as to Count III and plaintiff's motion is denied.

**Monell Claim**

Next we address plaintiff's *Monell* claim (Count VII) against Sheriff Sheahan in

his official capacity for an alleged custom of failing to supervise, train, and discipline officers. Such a claim against Sheriff Sheahan is also a claim against the Cook County Sheriff's Department. *See Sanders v. Sheahan*, 198 F.3d 626, 629 (7th Cir. 1999). In order to establish liability under Section1983, plaintiff must prove that a custom or policy of the sheriff's department caused his injury. *Ineco*, 286 F.3d at 1001.

True, plaintiff's *Monell* claim survived a motion to dismiss, although it bordered on "boilerplate vagueness". *See Cady v. Sheahan*, 02 C 5989, 2003 WL 288472 (N.D. Ill. Feb. 7, 2003) (Grady, J.). However, Cady did not introduce any material evidence at summary judgment that the defendant Officers were acting pursuant to an official custom or policy of the sheriff's department, thus warranting the entry of summary judgment for defendants on Count VII, plaintiff's *Monell* claim. See *Ineco*, 286 F.3d at 1001. We also note that Cady failed to suggest that "the actions of [the defendant Officers] extended beyond their role in his particular case." *Id*. (citing *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000) ("Ordinarily, one incident is not sufficient to establish a custom that can give rise to *Monell* liability.")). Therefore, defendants' motion for summary judgment as to Count VII is granted and plaintiff's motion is denied.

**State Law Claims**

Finally, we address plaintiff's claims for negligent and intentional infliction of emotional distress (Counts X and XI). "In order to establish a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must show that: (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant knew that there was a high probability that his or her conduct would cause severe emotional

distress or intended to cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Chen v. Mayflower Transit, Inc.,* No. 99 C 6261, 2002 WL 1632412 at *5 (N.D.Ill. July 22, 2002) (citing *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v. Fahey*, 126 Ill.2d 78, 533 N.E.2d 806, 809 (1988))).

To establish a claim for negligent infliction of emotional plaintiff must first show the traditional negligence elements of duty, breach, causation, and damages. *Fenner v. Favorite Brands Int'l, Inc.*, 97 C 5906, 1998 WL 249232 at *7 (N.D.Ill. May 12, 1998) (citing *Corgan v. Muehling*, 143 Ill.2d 296, 574 N.E.2d 602,606 (1991)). Further plaintiff must produce evidence that the alleged negligence involved a physical impact or injury that caused his emotional distress. *Fenner*, 1998 WL 249232 at *7. Based on the evidentiary record before the court, plaintiff has failed to provide any evidence that defendants' conduct was extreme and outrageous, or that it caused severe emotional distress. As stated above, the defendant officers were merely executing their duties as law enforcement officers. Accordingly, plaintiff's claims for negligent and intentional infliction of emotional distress are dismissed.

## *Conclusion*

For the reasons set forth above, plaintiff's two motions to amend his First Amended Complaint and defendants' motion to strike are denied. We also deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment, terminating this case. This is a final and appealable order. It is so ordered.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated:     August 24, 2004

21